SAN JUAN RACING CORPORATION, INC., demandante y recurrida, *v.* MUNICIPIO DE CAROLINA, demandado y recurrente.

*Número:* R-64-82      *Resuelto:* 23 de marzo de 1965

*J. B. Fernández Badillo, Procurador General, Rodolfo Cruz
Contreras, Procurador General Interino, María Luisa B.
Fuster* y *Américo Serra, Procuradores Generales Auxiliares,*
abogados del recurrente; *Córdova & Cebollero,* abogados de
la recurrida.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Santana Becerra emitió la opinión del Tribunal.

La recurrida San Juan Racing Association interpuso demanda en la Sala de San Juan del Tribunal Superior contra el Municipio de Carolina e impugnó la contribución de patente en la suma de $53,350 que le impuso dicho Municipio para el año fiscal 1962–63, basada en el volumen de negocios de la recurrida durante el año 1961 y que el Municipio demandado fijó en $27,000,000. Alegó la recurrida que su volumen de negocios durante el año natural de 1961 de todas las fuentes y en todos los municipios de Puerto Rico fue $7,357,457.65 y que de esa cantidad solamente $3,729,703.15 era atribuible al Municipio de Carolina y el remanente correspondía a apuestas hechas en otros municipios sobre las carreras celebradas en su hipódromo. La Asociación recurrida pagó bajo protesta $13,375.00 importe del primer trimestre, y solicitó su devolución. En los méritos la Sala de San Juan del Tribunal Superior dictó la siguiente:

### "Sentencia

"La San Juan Racing Association Inc. informó al Municipio de Carolina un volumen de negocios para el año 1961 de $7,357,457.65.

"El Municipio de Carolina determinó un volumen de negocios de $27,000,000 durante ese año e impuso la patente municipal a base de ese volumen de negocios.

"En la vista del caso las partes estipularon los siguientes hechos:

"1—Que la demandante tuvo un volumen de negocios de $27,127,733.08 durante el año 1961 y esta suma representa tanto la participación de la demandante, la participación de las personas que hacen sus jugadas y la del Estado Libre Asociado.

"2—De los $27,127,733.08 le correspondió a la demandante como su participación (%) en el negocio de toda la Isla de Puerto Rico la suma de $7,357,457.65.

"3—De los $7,357,457.65 corresponden $3,252,090.87 a negocios en el Municipio de Carolina.

"4—Se trata en el caso de la patente Municipal para el año 1962–63.

"La cuestión en controversia entre las partes es si procede la imposición de patente a base de:

"(a) $27,127,733.08 volumen de negocios total en todas las actividades de la demandante incluyendo las cantidades pagadas a las personas que hacen sus jugadas y la participación de El Estado Libre Asociado.

"(b) $7,357,457.65 que representa la participación de la demandante en el volumen de negocios en toda la Isla de Puerto Rico en los $27,127,733.08.

"(c) $3,252,090.87 que representa la participación de la demandante en el volumen de negocios en el Municipio de Carolina únicamente.

"El Municipio de Carolina puede imponer y cobrar patente municipal desde Julio 1, 1962 a base del volumen de negocios en Carolina únicamente y no del volumen de negocios en toda la Isla de Puerto Rico. (Ley 93 de 25 de junio de 1962).

"El negocio de hipódromo está sujeto a patente (Sec. 622—Grupo B—Tit. 21) sobre la base del volumen de negocios (Sec. 623) y se entenderá por volumen de negocios los ingresos brutos que tenga en cualquier Municipio procedente de las operaciones sin tener en cuenta sus ganancias o beneficios, el monto de los ingresos habidos por cualquier negocio hecho o *servicio prestado* de acuerdo con la naturaleza del negocio o industria establecido (Sec. 624).

"Procede la imposición de la contribución a la demandante por la suma que le corresponde por negocios en el Municipio de Carolina $3,252,090.87, a partir de Julio 1, 1962. No puede imponerse la contribución sobre la suma que paga a las personas que hacen las jugadas, ni sobre la participación que paga a El Estado Libre Asociado. La demandante es mas bien una depositaria y lo que presta es un servicio, siendo por tanto su volumen de negocios la cantidad total que recibe por concepto de compensación o remuneración por sus gestiones o esfuerzos. (Zerbe Penn Advertising Co. Inc. v. Berrocal—Sentencia de noviembre 30, 1962 Rev. 390 Trib. Supremo de P.R.).

"Procede por tanto la imposición de patente a base de $3,252,090.87 de ingreso, liquidándose de acuerdo con la sec. 623

Tit. 21 L.P.R.A. y el reintegro del exceso de esta suma hasta $13,375.00 pagados, con abono de intereses al 6% desde Julio 2, 1962 sobre la suma a reintegrarse."

El Municipio de Carolina, representado por el Procurador General, interpuso el presente recurso contra el anterior fallo. Señaló como errores: (1) el haberse determinado la contribución de patente a base de la suma de $3,252,090.87 que corresponde al ingreso por el volumen de negocios efectuado por la demandante recurrida en el Municipio de Carolina y, (2) el haber determinado el Tribunal Superior que no podía imponerse la patente sobre todas las operaciones realizadas por la demandante recurrida incluyendo la suma que ella paga a las personas que hacen las jugadas, y la participación que paga al Estado Libre Asociado.

La "Ley de Patentes Municipales"—Ley Núm. 26 de 28 de marzo de 1914 según ha sido enmendada, 21 L.P.R.A. (ed. 1961) secs. 621–639, autoriza a los consejos municipales a imponer una contribución por concepto de patente a cualquier forma de organización comercial o industrial dedicada a negocios o industria señalados en la Ley, sobre la base del *volumen de los negocios* efectuados durante el año natural inmediatamente anterior. La Sec. 4 de la Ley, según fue enmendada por la Núm. 93 de 25 de junio de 1962, define *volumen de negocios* como "los ingresos brutos que se obtengan de un negocio o industria en el municipio donde la casa principal realiza sus operaciones, o los ingresos brutos que se obtengan por la casa principal en el municipio donde ésta mantenga oficina de ventas, almacén, o cualquier tipo de organización comercial o industria para realizar negocios a su nombre, sin tener en cuenta sus ganancias o beneficios; . . . y en general el montante de los ingresos habidos por cualquier negocio hecho o servicio prestado de acuerdo con la naturaleza del negocio o industria establecido." El problema planteado es fundamentalmente la determinación de lo que constituye "ingresos brutos que se obtengan de un negocio o

industria" en una actividad de la naturaleza de la que lleva a cabo la Asociación recurrida. Específicamente, según lo puntualiza ésta en su alegato, determinar si en los ingresos brutos de la recurrida sujetos a la patente municipal debe incluirse el total de la suma jugada al *pool*, la banca y la quiniela o solamente la parte de dicha suma que por disposición de ley corresponde a la Asociación.

La Ley Hípica de Puerto Rico, Ley Núm. 149 de 22 de julio de 1960, dispone de la siguiente manera:

"Descuentos en Jugadas.—Las personas naturales o jurídicas explotadoras de los hipódromos harán los siguientes descuentos en las apuestas: 25 por ciento sobre la cantidad total aportada en las bancas, después de deducir el dinero apostado a los caballos ganadores en las respectivas carreras y el 30 por ciento del total bruto apostado en las jugadas de quiniela y *pool*.

"El total bruto que se derive por concepto de dichos descuentos, excepto de las bancas, se distribuirá en la forma siguiente: noventa y cinco por ciento (95%) para la persona natural o jurídica explotadora del hipódromo y cinco por ciento (5%) para el Fondo General del Tesoro Estatal. El descuento de las bancas será para el hipódromo.

"En los dividendos de las jugadas no se pagarán a los ganadores 1, 2, 3, ó 4 centavos o fracción de centavo, los cuales serán retenidos por la corporación dueña del hipódromo y liquidado semanalmente al Administrador, quien lo ingresará en el Fondo General del Tesoro Estatal.

"El derecho a cobrar los premios caducará a los seis (6) meses contados desde el día en que resulten premiados, y el dinero no reclamado por este concepto será inmediatamente remitido por la corporación dueña del hipódromo al Secretario de Hacienda, quien lo ingresará en el Fondo General del Tesoro Estatal". (1)

---

(1) El Reglamento Hípico de 23 de febrero de 1962, 15 R.&R.P.R.— Sec. 186–1—define "banca" como el lugar designado para efectuar apuestas en cada carrera y el sistema de apuestas conocido con tal nombre; "dupleta (quiniela)" como la apuesta para acertar los ganadores de dos carreras específicamente designadas para tal apuesta; y *"pool"* como un sistema de apuesta consistente en acertar el mayor número de ejemplares ganadores y el mayor número de ejemplares ganadores menos uno, de un día de

El negocio a que se dedica la Asociación recurrida presenta, a los efectos de la imposición de patentes, características especiales debido a la dualidad de sus operaciones. En un sentido guarda cierta analogía con la situación en los casos

carreras y que aparecieren en las papeletas y cuadros de combinaciones recibidas, selladas y registradas debidamente por la Asociación—Sec. 186–611. El precio de venta de un impreso de cuadro al público no excederá de diez centavos y se adicionará cualquier impuesto fijado por ley, y el precio de venta de un impreso de papeleta al público no excederá de siete centavos más cualquier impuesto fijado por ley—Secs. 186–633, 634.

La Sec. 186–640 dispone que el total bruto del *pool* consistirá de las apuestas hechas en las agencias y en el hipódromo luego de *descontada la comisión* que le corresponde a los agentes; y que la Asociación descontará el 30% del total bruto del *pool* reteniendo el 95% de dicho descuento para sí y remitiendo el 5% al Secretario de Hacienda con copia de la liquidación al Administrador. (Obsérvese que el Art. 12 de la Ley Hípica fija el 30% sobre el total bruto *apostado* lo cual aparentemente no es lo mismo por lo menos a los efectos del problema de patente aquí envuelto.) Las jugadas en bancas deberán hacerse dentro de los terrenos del hipódromo—Sec. 186–650. Si se retira un ejemplar después de haberse empezado las apuestas, el dinero apostado al mismo en banca será deducido y devuelto a los apostadores—Sec. 186–660. Igual devolución se hará bajo la Sec. 186–661 cuando uno de los ejemplares que forma parte de un *"entry"* es retirado. Igual devolución se hará—Sec. 186–662—cuando se retira uno de los dos ejemplares que constituyan un *"field"*. Igual devolución se hará— Sec. 186–663—cuando el *"field"* lo constituyan más de dos ejemplares y se retiren dos o más de ellos. Igual devolución se hará cuando en cualquiera de las situaciones anteriores el Juez de salida determina que un ejemplar ha sido impedido de correr por no haberse abierto la puerta de la jaula —Sec. 186–664. Todo el dinero apostado en banca será devuelto a los apostadores, bajo la Sec. 186–678, si ningún ejemplar termina una carrera, e igual devolución se hará cuando la carrera es suspendida por el jurado— Sec. 186–679. La Sec. 186–684 dispone que en los pagos de *pool*, banca y dupleta no se incluirán 1, 2, 3, 4 ó fracción de centavo y que estos centavos serán retenidos por la Asociación y remitidos por el Administrador al Secretario de Hacienda.

Según la Sec. 186–687, del total apostado en bancas de primera se deducirá el dinero apostado al ejemplar ganador; del balance se descontará el 25% autorizado por la Ley Hípica para la Asociación; del balance remanente se deducirá el 10% de arbitrios, y el resto será la cantidad neta a repartir entre los ganadores. Parecida distribución se hará en bancas de segunda—Sec. 186–688.

En cuanto a las apuestas de dupleta (quiniela) la Sec. 186–707 fija un precio de venta del impreso que no excederá de diez centavos, cuando se obtenga de un agente, y el Administrador determinará el precio que la Asociación podrá cobrar al agente por dicho impreso—Sec. 186–708. Según

de *Zerbe Penn* v. *Gob. de la Capital*, 86 D.P.R. 618 (1962), y *Cía. Azucarera del Toa* v. *Municipio de Toa Baja*, Sentencia de 30 de junio de 1958. En otros sentidos el negocio de la Asociación recurrida es distinto a las de esos casos. En el caso de *Zerbe*, se trataba de agencias de publicidad dedicadas al anuncio y promoción de bienes y cosas a través de distintos medios publicitarios. El Tribunal de instancia consideró como "volumen de negocios" de dichas agencias publicitarias todas las cantidades recibidas por ellas de sus clientes o usuarios, de las cuales las agencias debían costear los medios publicitarios y sólo un 15% les correspondía por razón de sus servicios o actividades. No estuvimos de acuerdo con la Sala sentenciadora en el sentido de que el volumen de negocios de aquellas agencias a los fines de la imposición de patentes, lo constituían todas las cantidades recibidas de los clientes. Nos expresamos así:

"La resolución de este recurso depende, pues, de la determinación de lo que constituye el 'volumen de negocios' de las recurrentes. La sección 4 de la Ley de Patentes, en cuanto se refiere a las agencias de publicidad, no contiene una referencia específica a ello, como en el caso de los bancos, las tiendas y casas de comercio, las empresas de transporte terrestre, servicios telefónicos y eléctricos, y los agentes comisionistas o corredores. Debemos atenernos, por tanto, a la definición general, según regía para los años contributivos aquí envueltos, (⁴) que dice: 'se entenderá por volumen de negocios . . . los ingresos brutos que tenga en cualquier municipio el negocio o industria procedentes de las operaciones que realiza en Puerto Rico, sin tener en cuenta sus ganancias o beneficios . . .' y añade, 'el monto de los ingresos habidos por cualquier negocio hecho o *servicio prestado*, de acuerdo con la naturaleza del negocio o industria establecido.'

---

la Sec. 186–722, del total apostado a la dupleta, se deduce el 30% fijado por ley; del balance el 10% de arbitrios, y el remanente se divide entre los agraciados.

Finalmente, todos los premios de *pool*, dupleta y banca caducarán a los seis meses e irán a ingresar en los fondos del Tesoro de Puerto Rico— Secs. 186–620, 666, 724.

"A nuestro juicio las citadas disposiciones están dirigidas a significar que el importe de la contribución recae sobre ingreso bruto y no sobre ingreso neto—de ahí la referencia a que el volumen de negocios se determina irrespectivamente de las ganancias o beneficios—, y a distinguir—por la naturaleza del negocio o industria—entre el monto de ingresos cuando se originan por la realización de un negocio o por la prestación de un servicio. No es necesario elaborar demasiado para concluir que una agencia de publicidad se dedica esencialmente a la prestación de servicios y que las operaciones que realiza son aquellas relacionadas con la prestación de estos servicios, siendo, por ende, su volumen de negocios, la cantidad total que recibe por concepto de compensación o remuneración por sus gestiones o esfuerzos".

Después de referirnos al caso de *Cía. Azucarera del Toa* v. *Municipio de Toa Baja*, continuamos con *Zerbe*:

". . . Con mayor razón aun, en el caso de las agencias de publicidad no podemos atribuirles como parte de su volumen de negocios las cantidades que representan el costo del anuncio; éste forma parte propiamente del volumen de negocios del medio publicitario. Es por eso que la pretendida comparación con el agente comisionista que vende mercancías a comisión es de todo punto improcedente. La agencia de publicidad presta servicios, no vende productos. En todo caso, según la norma de hermenéutica que expusimos en *Cervecería India* v. *Municipio*, 77 D.P.R. 100 (1954), procedería una interpretación restrictiva en cuanto al alcance de la facultad impositiva".

En el caso de la *Cía. Azucarera del Toa*, antes citado, hubo que determinar si a los efectos de la contribución de patentes el volumen de negocios de la Central Constancia para el año 1953–54 era de $4,342,414.77 valor de todos los azúcares molidos y mieles producidas por dicha Central, o si por el contrario, su volumen de negocios era sólo $1,598,389.31 valor de dichos azúcares y mieles producidos que constituía la participación de la Central de acuerdo con la Ley Azucarera entonces vigente, correspondiendo la diferencia a azúcares y mieles producidos pertenecientes a otros colonos. En ese caso la Central no molía caña alguna de su propiedad. Resol-

viendo la cuestión la Sala de primera instancia se expresó así en parte:

"La Sección 4 explica que se entenderá por volumen de negocios para los efectos de esa Ley, los *ingresos brutos* que tenga en cualquier municipio el negocio o industria procedentes de las operaciones que realice en Puerto Rico, sin tener en cuenta sus ganancias o beneficios; . . . y en general, *el montante* de los ingresos habidos por cualquier negocio hecho o servicio prestado, de acuerdo con la naturaleza del negocio o industria establecido.

"Las centrales azucareras funcionan como entidades de servicio público bajo rigurosa reglamentación y un sistema tarifario contenido en la Ley 426 de 13 de mayo de 1951 conocida como 'Ley Azucarera de Puerto Rico'. Dice el Artículo 3 de esta Ley que ninguna central azucarera podrá negarse a moler la caña de un colono o sus sucesores o causahabientes que hubiera sido colono de la central . . . y vendrá igualmente obligada a moler la caña de los nuevos colonos, a menos que la Junta Azucarera la exima de tal obligación después de haberse demostrado que la central carece de suficiente capacidad para asumir la molienda de dichos nuevos colonos.

"Hay ocasiones en que la central muele, en adición a la caña de colonos, caña producida por ella misma. En el caso de autos la demandante no cosecha caña y se dedica solamente a dar servicio de molienda a terceras personas. Si la demandante se dedica a la prestación de un servicio público el cual por ley ella viene obligada a prestar indiscriminatoriamente, cual es el de molienda de caña y su conversión en azúcares y mieles comerciales, no tenemos la menor duda de que el *negocio o industria* de la demandante es el de la prestación de un servicio. De ello surge como corolario que el volumen de negocios de la demandante lo constituye el producto *bruto* de lo que ella recibe u obtiene por la prestación de tal servicio. A cambio de ese producto bruto o compensación, y para obtener el mismo, es que ella opera su negocio o industria. En este sentido la demandante como prestadora de un servicio público está en una posición similar a los servicios de transporte, telefónicos o eléctricos mencionados en la Sección 4 de la Ley de Patentes Municipales, en cuyo caso se dispone que el volumen de negocios se entiende que es el importe de lo recaudado por tales servicios, y cae igualmente en la dis-

posición general al final de la Sección 4 a los efectos de que se entiende por volumen de negocios el montante de los *ingresos* habidos por cualquier . . . servicio prestado.

"Si la industria azucarera operara por ley bajo un régimen tarifario más simple, como por ejemplo el que la central recibiera por cada quintal o tonelada de caña entregada para su molienda a cambio de ser molida, en la misma forma en que se pagan otros servicios públicos, la central tendría sólo un ingreso bruto en efectivo como consecuencia de sus operaciones. Nadie discutiría que el monto de tal ingreso bruto representaría el volumen de su negocio. Pero por la naturaleza de esta industria, la forma en que se ha dispuesto por ley para que la central cobre por sus servicios es un tanto más complicada que el pago en efectivo por unidad molida. Al convertir la caña en azúcar y en mieles, la central puede retener para ella un determinado por ciento de los azúcares y de las mieles producidas en pago de su servicio, y el resto corresponde al colono. Unas veces se le entrega al colono su parte en especie, azúcar y mieles, como resulta ser con la Autoridad de Tierras en el caso de autos, y otras veces la central, bajo reglamentación de ley retiene el azúcar y las mieles para venderlas en el mercado como agente del colono y paga a éste en efectivo su participación. Cualquiera que sea el sistema seguido, siempre habría que concluirse que la central recibe a cambio de sus servicios sólo el valor en dinero que representan los azúcares y las mieles que le corresponden a ella bajo la tarifa de ley, como consecuencia de su proceso industrial, ya que ella nunca adquiere título de propiedad sobre, ni le pertenecen, las participaciones del colono. No constituiría parte de su volumen de negocio, según el mismo Legislador definió este concepto en la Sección 4 de la propia Ley de Patentes, el valor de la participación correspondiente a los colonos.

"El Municipio demandado hace un gran esfuerzo por demostrar lo contrario. Si se tratara, como en la Ley Azucarera de Estados Unidos o como en la Ley de Rentas Internas local, de tributar a la demandante a base del volumen de su producción industrial, como lo sería la contribución impuesta sobre cada quintal de azúcar elaborado o sobre cada galón de mieles producido, el Municipio tendría razón. Pero el concepto de 'volumen de negocios' que da la propia Ley de Patentes Municipales no

contempla, en el caso de esta industria, el volumen de producción industrial total, salvo en aquel caso, si fuese factible bajo la presente legislación azucarera, en que la central hubiera molido única y exclusivamente caña de su propiedad.

"La Sección 2 de la Ley al establecer los grupos de negocios y actividades cubiertos por la misma, incluye bajo el Grupo C las industrias de molinos de azúcar y mieles. Ello fue meramente la manera de expresar que entre los negocios y actividades cubiertos por la ley estaba la industria azucarera. A la luz de las Secciones 3 y 4 que le siguen, lo dicho en la Sección 2 no implica que la patente se impone a base de cada unidad de azúcar o de mieles elaborados, ya que la propia Ley, según así lo ha reconocido nuestro Tribunal Supremo en *Cervecería India* vs. *Municipio de Mayagüez*, 77 DPR 100, decidido en 9 de agosto de 1954, establece que la patente se impone al ingreso bruto de la industria, que es como define el *volumen de negocios*.

"El ingreso bruto de la demandante fue la compensación recibida por ella de acuerdo con la tarifa a cambio del servicio de molienda que prestó a los colonos, compensación ésta que en dólares y centavos representó la cantidad de $1,598,389.31. Nadie pensaría que la demandante vendría obligada a pagar contribución sobre ingresos a base de un ingreso bruto que incluyera además el ingreso de los colonos. Posiblemente el Municipio creyó encontrar apoyo a su petición en el hecho de que la Sección 4 de la Ley de Patentes al definir cuál es el volumen de negocios de los bancos incluye el montante de los préstamos que realizan. El Legislador pudo haberlo dispuesto así, y se explica por la naturaleza en sí de los negocios bancarios. Pero ya dijimos que la demandante, como entidad de servicio, cae más bien bajo las disposiciones de la Sección 4 referentes a este tipo de empresas."

Se dictó sentencia considerando como volumen de los negocios de la Central, para fines de patentes, solamente la participación que a ella correspondía de los azúcares y mieles producidos. Esa sentencia fue impugnada ante este Tribunal aduciéndose que había sido erróneo sostener que el volumen de negocios de la Central no era el monto total del valor de lo producido resultado de la molienda, y sí la participación

correspondiente a la empresa. Este Tribunal, en Sentencia de 30 de junio de 1958, confirmó el fallo. (²)

■ La Asociación recurrida, por otra parte, no es en su totalidad una entidad que ofrece servicios. Ella es una organización comercial como cualquier otra a que se refiere la Ley de Patentes. Pero dentro de su explotación hay ciertas fases especiales. Hay que admitir que ante cierto tipo de actividad a veces debe ser difícil a la autoridad municipal fijar con corrección el concepto "volumen de los negocios", sobre todo, cuando no se tiene la ayuda del propio estatuto como en el caso de los bancos y otras transacciones. No obstante, este Tribunal tiene señalados ya ciertos criterios que pueden utilizarse como guía, y que no consideran volumen de negocios e ingreso bruto todo producto o valor manejado por las contribuyentes, sino que ha conservado el concepto usual y corriente del término ingreso, o sea, aquel producto bruto que viene a acrecentar el haber de un individuo o empresa.

[2] Considerando este caso a la luz de los criterios establecidos por el Tribunal en cuanto al concepto de volumen de negocios definido en términos de los ingresos brutos que se obtengan; a la luz de sus operaciones, y de todas las demás circunstancias, hay que concluir que constituye ingreso bruto para la Asociación recurrida toda cantidad que allegue en concepto propietario, por cualquier concepto, incluyendo el 25% sobre la cantidad total apostada en las bancas después de deducir lo apostado a los caballos ganadores y el 30% del total bruto apostado en las jugadas de quiniela y *pool.*

(²) La Sentencia de este Tribunal fue la siguiente: "Examinados los autos y estudiadas las cuestiones que plantean las partes en sus alegatos, este Tribunal es de opinión que carecen de méritos los tres errores apuntados por el apelante en estos recursos y que, por los motivos señalados en la opinión que dictó en estos casos el tribunal a quo, procede confirmar, como por la presente se confirman, las sentencias apeladas dictadas por el Tribunal Superior, Sala de San Juan, con fecha 13 de septiembre de 1955." Habiendo este Tribunal aceptado, no sólo el fallo, si que también sus fundamentos, se han transcrito en parte por la orientación que puedan dar en este tipo de controversias.

■ No puede considerarse volumen de negocios e ingreso bruto de la Asociación recurrida, a los efectos de la imposición de patentes, aquellas cantidades jugadas en las bancas que son devueltas a los jugadores en ciertas circunstancias, a tenor de las disposiciones reglamentarias citadas (véase escolio 1), o aquellas otras repartidas a los jugadores de bancas victoriosos; ni tampoco aquellas cantidades apostadas a la quiniela y al *pool* que son repartidas e indirectamente devueltas al público por vía de premios a los apostadores triunfantes. Como cuestión de hecho y de derecho a la luz de la Ley Hípica y de su reglamentación, estas sumas así devueltas o repartidas entre el público nunca han sido propietariamente de la recurrida. Siempre han pertenecido a los apostadores que levantan esos fondos para distribuírselos luego según quienes sean los ganadores. Véase la norma sentada en *Fernández* v. *Las Monjas Racing Corp.*, 52 D.P.R. 787, 790 (1938), descriptiva de la naturaleza fiduciaria del fondo de las apuestas.

■ En el aspecto que tratamos, la recurrida sólo ofrece o aporta con su empresa, bajo una estricta intervención del Estado, el servicio de sus empleados, agentes, su equipo y propiedades y los medios físicos necesarios y adecuados para que un público jugador pueda llevar a efecto sus contratos de apuesta, levantar un fondo común y repartírselo. En este sentido la recurrida se asemeja mucho a *Zerbe* y a *Toa*.

■ Constituye ingreso bruto de la Asociación recurrida todo el 30% del total bruto apostado en las jugadas de quiniela y *pool*. El 5% a que se refiere la Ley que va al Fondo General del Tesoro, participa de la naturaleza de una exacción o arbitrio impuesto. Considerarlo de otra manera equivaldría a entender que el Gobierno está dedicado a la explotación de carreras de caballos en calidad de empresario y socio minoritario de la recurrida. No nos parece que esa haya sido la intención legislativa. Por tratarse de ingreso bruto tampoco debe eliminarse cantidad alguna que la Asociación pague a los

dueños de caballos o a los jinetes en premios o por cualquier otro concepto, ni tampoco lo que paga a sus agentes por vía de comisión, ni gasto, contribución directa o indirecta o desembolso otro alguno. En resumen, la recurrida debe tributar al Municipio sobre toda cantidad o valor bruto que ingrese en sus arcas, excepto estrictamente aquellas sumas depositadas con ella por los apostadores, y son devueltas a éstos o son repartidas entre ellos sujeto a ley.

Establecida la esfera de tributación, veamos un segundo aspecto del caso que gira sobre el primer error levantado y que se refiere a la determinación de la Sala sentenciadora al efecto de que el recurrente puede tributar a base del volumen de negocios en Carolina únicamente y no del volumen de negocios de la Asociación en toda la Isla de Puerto Rico, y como consecuencia de ello dispuso que el recurrente podía tributar sobre un volumen de negocios menor de $3,252,090.87 comparado con $7,357,457.65. No obstante el error levantado, en su alegato el recurrente parece allanarse a la determinación de la Sala sentenciadora al exponer:

"De acuerdo con la Ley #93 de junio 25 de 1962, efectiva el 1ro. de julio de 1962, enmendando el Art. 1 de la Ley de Patentes Municipales, el municipio de Carolina puede imponer la patente municipal sobre todos los negocios realizados por la San Juan Racing dentro de los límites territoriales del municipio de Carolina no pudiendo incluir dentro de esos ingresos brutos los ingresos por negocios realizados en oficinas o sucursales que tenga la San Juan Racing, en otros municipios de la isla.

"Por lo que estamos acordes con el Tribunal a quo, en cuanto a que del volumen total de negocios realizados por la San Juan Racing, hay que descontar los realizados por ésta en otros municipios de la isla que no son Carolina, si así los hubiere."

Lo anterior puede contener una declaración correcta de la ley pero no implica necesariamente que la determinación de la Sala sentenciadora a este respecto haya sido correcta. Todavía hay que determinar dónde es que la Asociación recurrida realiza sus negocios.

Descartando todos aquellos ingresos que necesariamente tienen que producirse en el local del hipódromo de la recurrida, dentro de la demarcación política del Municipio recurrente, así como las jugadas en bancas que no pueden realizarse sino en el hipódromo, Regl. Sec. 186–650, este aspecto del problema se relaciona mayormente, si no en su totalidad, con las apuestas de quiniela y para el *pool* que de acuerdo con el Reglamento Hípico pueden hacerse en cualquier punto de Puerto Rico por medio de agentes.—Secs. 186–605, 701.

La Sec. 186–602 del Reglamento dispone que la Asociación designará agentes hípicos *para recibir* apuestas de *pool* y dupleta, y que la designación deberá ser aprobada por el Administrador. La Asociación debe suplir a los agentes todo el material necesario para las apuestas, Sec. 186–603; y se dispone, Sec. 186–604, que la Junta Hípica fijará la comisión que recibirán los agentes por las apuestas que por su conducto se hagan siendo dicha comisión una participación del valor total de las combinaciones jugadas en la agencia. Cuando se hace la jugada en los terrenos del hipódromo la Asociación no tiene derecho a recibir comisión. Los cargos que la Asociación puede cobrar a los agentes por el material y el uso del equipo para las apuestas deben ser sometidas al Administrador y a petición de éste o parte interesada pueden ser revisadas por la Junta Hípica, Sec. 186–609. La Asociación puede requerir fianza a los agentes, Sec. 186–610. La Sec. 186–628 impone al agente la obligación de dar cuenta de todos los impresos de cuadros y papeletas que se le entreguen incluyendo los dañados que serán marcados "nulo" y devueltos. La Asociación debe llevar un récord de dichos impresos "nulos" y de los no devueltos que debe entregar al jurado antes de celebrarse la primera carrera válida para el *pool*. Todos los impresos jugados deben ser registrados y se prepararán hojas de cotejo, Sec. 186–629. Al cerrarse el *pool* todos los cuadros y papeletas deben ser guardados en un armario de acero bajo dos cerraduras que no podrá ser

abierto hasta que se celebre el escrutinio, Sec. 186–630. De acuerdo con la Sec. 186–631 cualquier cuadro o papeleta que aparezca en la hoja de cotejo como no devuelto, no se considera válido a los efectos del escrutinio ni puede participar en el reparto del *pool*.

◾ Finalmente, lo que constituyen las disposiciones más importantes en la consideración del problema envuelto, estatuye la Sec. 186–611 ya citada que el *pool* es el sistema de apuesta consistente en acertar el mayor número de ejemplares ganadores *y que aparecieren* en las *papeletas* y *cuadros* de combinaciones *recibidas, selladas y registradas debidamente* por la Asociación, y la 186–632, que ningún cuadro o papeleta tendrá valor ni conferirá acción ni derecho alguno contra la Asociación, hasta tanto y a menos que los mismos *sean entregados y registrados* en el *pool;* pero respondería de los premios si no ha notificado el jurado antes de la primera carrera válida para el *pool* con un récord de los impresos "nulos" y de los no devueltos por la agencia. Parecidas disposiciones rigen en el Reglamento en relación con las apuestas de dupleta o quiniela, Secs. 186–704, 709. Cf. *Díaz* v. *Hipódromo El Comandante*, 87 D.P.R. 809 (1963).

◾ De las anteriores disposiciones del reglamento con fuerza de ley surge que la determinación de dónde hace negocios la recurrida viene a ser, en última instancia, una cuestión de derecho. Como cuestión de ley ninguna jugada hecha en una agencia para el *pool* y para la quiniela crea un contrato de apuesta válido entre los apostadores hasta tanto dicha apuesta contenida en una combinación sea recibida, aceptada y registrada *en el local* del hipódromo en el sitio allí designado por el Administrador. Una vez que se recibe y se registra en tiempo la apuesta de un jugador y va a una hoja de cotejo es cuando se ha perfeccionado el contrato de juego que da derecho al apostador a recibir el importe del *pool* o de la quiniela que corresponda si su jugada fuera premiada. Aun cuando, como cuestión de hecho, el agente reciba la

jugada en cualquier parte de la Isla fuera de la demarcación política del Municipio de Carolina, como cuestión de derecho no hay contrato de apuesta válido exigible hasta que dicha jugada es recibida, aceptada y registrada dentro de la demarcación de dicho Municipio. Todo negocio de *pool* y dupleta que realiza la Asociación recurrida lo efectúa, de derecho, en el Municipio de Carolina y debe tributar a este Municipio sobre la totalidad de lo que le corresponda en esta actividad.

En tanto el fallo de la Sala sentenciadora no incluyó las cantidades del *pool* y dupleta devueltas o repartidas entre los jugadores, el mismo sería correcto. En tanto pudo resolver en derecho la recurrida hace negocios fuera del Municipio de Carolina a los efectos de la contribución de patentes, no sería correcto. En vista de que este caso fue sometido en virtud de la estipulación transcrita, sin que podamos determinar con certeza si las cantidades fijadas en dicha estipulación responden a las normas de tributación que aquí sentamos, resulta aconsejable que se deje sin efecto la sentencia y se devuelva el caso a la Sala de instancia, como en *Zerbe*, para que, a tenor de los pronunciamientos aquí hechos, se compute la contribución que deberá ser pagada, y se dicte sentencia fijando las cantidades exactas a ser devueltas.

*Se dictará sentencia de conformidad con lo expresado.*

